UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>JOSE MANUEL ANGULO-GALAVIZ,<br><br>  Defendant. | Case No.: 17cr3671-CAB<br><br>**AMENDED ORDER ON MOTION TO DISMISS [Doc. No. 25]** |

Defendant Jose Manuel Angulo-Galaviz is charged with an attempted illegal re-entry on October 24, 2017, in violation of 8 U.S.C. § 1326. To convict an alien criminal defendant of illegal reentry under 8 U.S.C. § 1326, the government must prove that the alien left the United States under order of exclusion, deportation or removal, and then illegally reentered. *U.S. v. Barajas-Alvarado*, 655 F.3d 1077, 1079 (9th Cir. 2011). The predicate prior removal must be valid, legal and comport with due process requirements. Mr. Angulo moves for dismissal of the charge under 8 U.S.C. § 1326(d) asserting that neither his expedited removal proceeding on August 24, 2000, or his Order of Removal on June 3, 2004, satisfy the predicate removal requirements for the indicted charge. [Doc. No. 25.]

/ / / / /

/ / / / /

1

## A. Legal Standard.

To sustain a challenge to an indictment under § 1326, a defendant must demonstrate that (1) he exhausted the administrative remedies available for seeking relief from the predicate removal order; (2) the deportation proceedings 'improperly deprived [him] of the opportunity for judicial review'; and (3) the removal order was 'fundamentally unfair.'" *U.S. v. Raya-Vaca*, 771 F.3d 1195, 1201 (9th Cir. 2014). To show that a removal order is fundamentally unfair, a defendant bears the burden of establishing that the removal proceeding violated his due process rights and that the violation caused prejudice. *Id.* at 1202.

To establish prejudice, a defendant must establish that he had "plausible grounds" for receiving immigration relief. Where the relevant form of relief is discretionary, the alien must make a plausible showing that the facts presented would cause the Attorney General to exercise discretion in his favor. A plausible showing does not require the aliens establish that he definitely would have received immigration relief, but it requires more than establishing the mere possibility. *Barajas- Alvarado,* 655 F.3d at 1089.

## B. Defendant's 2000 Expedited Removal.

On August 23, 2000, the defendant was apprehended in the United States at the San Ysidro Port of Entry. He was served with a Notice and Order of Expedited Removal charging him with applying for admission with a counterfeit immigration document. [Doc. No. 25-2, at 24 and 26.][1] He was processed for expedited removal by Immigration Inspector J.A. Castilla on August 24, 2000. [*Id.*; Doc. No. 25-2, at 28-30.] At the conclusion of the interview, Agent Castilla ordered the defendant removed and he was removed that same day for a period of five years. [*Id.*; Doc. No. 25-2 at 32.]

---

[1] Page cites refer to the ECF assigned page designations at the top of the docketed document.

Mr. Angulo asserts that this expedited removal violated due process.[2] The defendant contends that he was not advised of the charge against him and was instructed to sign and initial his Record of Sworn Statement Form without it first having been read to him in violation of the regulations set forth in 8 C.F.R. § 235.3(b)(2)(i) (requiring the examining immigration officer to advise the alien of the charge against him and have the alien read (or read to him) the record of sworn statement before it is signed). [Doc. No. 25-1, at 21-23.] Defendant further contends he was not advised of his right to have counsel present during his expedited hearing [*id*., at 23] and was not advised of his "option to seek withdrawal of his application for admission." [*Id*., at 28.]

The defendant was apprehended at the Port of Entry attempting to enter the United States using a false document. A non-admitted alien subject to expedited removal at the border is not entitled to "any procedure vis-à-vis their admission or exclusion. Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *U.S. v. Garcia-Gonzalez*, 791 F.3d 1175, 1177 (9th Cir. 2015)(internal cite omitted). The defendant's removal procedure is judged solely by the procedures set out in 8 U.S.C. § 1225(b) and 8 C.F.R. § 1235.3(b). *Id.*

A defendant in an expedited removal proceeding under § 1225 has no right to counsel. *See Barajas-Alvarado,* 655 F.3d at 1088 (non-admitted aliens who have not entered the United States do not have such a right). Nor is there a right to be informed of the opportunity to request withdrawal of an application for admission. *See U.S. v. Sanchez-Aguilar*, 719 F.3d 1108, 1112 (9th Cir. 2013) (the procedural rights to which non-admitted aliens are entitled do not include the right to be informed of potentially available avenues of relief from removal.) Consequently, failure to advise Mr. Angulo

---

[2] An individual who is removed via an Expedited Removal is not entitled to administrative or judicial appeal. *Barajas- Alvarado,* 655 F.3d at 1082. The government therefore acknowledges that with regard to his August, 2000 expedited removal proceeding the defendant satisfies the first two prongs of the § 1326(d) analysis. [Doc. No. 31, at 26.]

3

17cr3671-CAB

that he could consult counsel or request to withdraw his application for admission did not violate the defendant's due process rights.[3]

The regulations governing expedited removal proceedings however codify, in mandatory terms, the immigration officer's duty to inform the alien of the charge against him and to allow the alien to review the sworn statement prepared in his name. 8 C.F.R. § 235.3(b)(2)(i). A failure to inform the defendant of the charge against him and to provide him the opportunity to review the sworn statement constitutes a due process violation. *Raya-Vaca*, 771 F.3d at 1204.

Mr. Angulo submitted a declaration stating in "August of 2000, [he] was arrested by Border Patrol agents near the United States-Mexico border" and "was taken to a Border Patrol station." [Doc. No. 25-2 at 4, ¶¶ 15-16.] He states he does "not remember the agents reading me any charges against me." He affirmatively states "the agent did not read me the information he put on the form and did not give me an opportunity to read all of the pages. The agent simply told me where to put my initials and where to sign." [*Id.*, at 4, ¶¶17-19.]

Agent Castilla submitted a declaration [Doc. No. 33-2, at 1-4] stating he reviewed the expedited removal documents for Mr. Angulo dated August 24, 2000, including the Record of Sworn Statement [Doc. No. 25-2, at 28-30], and confirms he prepared them. [Doc. No. 33-2, at 2, ¶4.] Agent Castilla states that he cannot recall the details of his encounter with the defendant that day, but has "no reason to believe [he] deviated from [his] standard procedures" and that he conducted the procedure in an office at the San

---

[3] In *U.S. v. Peralta-Sanchez*, 705 Fed. Appx., 542, 544 (9th Cir. 2017), the appellate court "assumed for purposes of [the Peralta-Sanchez] case only that [there is] a due process right to retain counsel at [the alien's] own expense and to be advised by the government of the right to seek withdrawal of admission" in a § 1225 expedited removal proceeding, and therefore turned to the question of whether Peralta-Sanchez proved he was prejudiced by these violations. This assumption expressly applied only to the *Peralta-Sanchez* case is not understood to constitute a change in Ninth Circuit precedent. If, however, these advisals are ultimately determined to be mandatory to comply with due process, the Court is reaching the analysis of whether the defendant in this case has established prejudice based on the defendant's other asserted due process violation.

4

Ysidro Port of Entry. Agent Castilla declared that his standard practice was to conduct an interview of the individual to prepare the Sworn Statement. He would speak in English, or Spanish if the individual was a Spanish speaker, reading out loud the introductory paragraphs and recording the answer to each question contemporaneously on the computer. [*Id*., at 2-3, ¶¶ 5-6.] He states he would review each question and answer with the individual and make any needed changes and confirm the form had been read by, or to, the individual and he or she agreed with it, and then have the individual sign and initial each page. [*Id*., at 3, ¶ 6.]

It is the defendant's burden to establish a due process violation. *Raya-Vaca*, 771 F.3d at 1202. In *Raya-Vaca*, the defendant asserted by declaration that no immigration officer explained the nature of the proceeding or that he could be removed, and the immigration officer did not read or permit him to review the sworn statement before he signed it. In response, the government did not argue that the immigration officer complied with the regulations and advised Raya-Vaca of the charge, or read to him or allowed him to read the sworn statement. *Id.* at 1205. Taking into consideration the defendant's declaration, an error on the form and the government's failure to contest the allegation, the court held that the immigration officer failed to advise Raya-Vaca of the charge against him and to permit him to review the sworn statement in contravention of his due process rights. *Id*.

In this case, Mr. Angulo's declaration is countered by Agent Castilla's declaration. Mr. Angulo declares he could not remember if he was advised of the charges.[4] [Doc. No. 25-2, at 4, ¶ 17.] Agent Castilla declares it was his standard practice to read the introductory paragraph of the sworn statement that would have informed Mr. Angulo that

---

[4] Mr. Angulo declares he was arrested "near the border" and "taken to a border patrol station." [Doc. No. 25-2, at 4, ¶¶ 15-16.] On August 21, 2000, Mr. Angulo was arrested by Border Patrol in San Clemente, California, when he was driving a vehicle containing a total of five undocumented aliens, and processed at the border patrol station and allowed voluntary return. [Doc. No. 36-1, at 20-21.] The Expedited Removal proceeding on August 24, 2000, was at the San Ysidro Port of Entry in a port office. It is therefore possible he is conflating these two events in his recollection of what occurred 18 years ago.

he did not have the legal papers authorizing his admission to the United States, he could be immediately returned without a hearing and be barred from reentry for a period of five years or longer. [Doc. No. 33-2, at 2-3, ¶ 6; Doc. No. 36-1, at 24.]

Mr. Angulo declares the agent did not read the information the agent put on the form to him or give him an opportunity to read all of the pages; he was simply told where to initial and sign.[5] [Doc. No. 25-2, at 4, ¶¶ 18-19.] Agent Castilla declares that it was his standard practice to review all the recorded answers with the individual and confirm them before obtaining the individual's initials and signature on the form. [Doc. No. 33-2, at 2-3, ¶ 6.]

The issue of whether there was a violation of the regulations in the processing of Mr. Angulo is therefore is disputed. Mr. Angulo references congressionally commissioned reports from 2005 and 2007 that found systemic error by Border Patrol agents conducting expedited removals, as further support for his assertion that Agent Castilla did not follow proper protocol. [Doc. No. 25-1, at 22.] The Court does not find this information persuasive in determining what occurred on August 24, 2000. Evaluating Mr. Angulo's recollections and Agent Castilla's representations of his standard practices leaves the matter at odds. The Court therefore concludes that Mr. Angulo has not met his burden to demonstrate his due process rights were violated. However, even resolving this dispute in Mr. Angulo's favor, the Court finds that Mr. Angulo has not established prejudice.

To establish prejudice, a defendant must establish that he had "plausible grounds" for receiving immigration relief. An arriving alien may ask to withdraw an application for admission, the grant of such relief is discretionary. *See Barajas-Alvarado*, 655 F.3d

---

[5] Mr. Angulo states he does not read English [Doc. No. 25-2, at 3, ¶ 5] so he could not have read the document. The dispute turns on whether the recorded answers were read to him before he was asked to initial and sign. Mr. Angulo does not contest in his declaration that any of the recorded responses are incorrect or incomplete.

at 1089 (an immigration officer has the authority to permit an alien to withdraw an application for admission under certain circumstances); 8 C.F.R. § 1235.4.

The Inspector's Field Manual sets forth six factors that the immigration officer should consider in the exercise of his or her discretion when evaluating an alien's request for permission to withdraw: (1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law; (4) ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and (6) other humanitarian or public interest considerations. *See Barajas-Alvarado*, 655 F.3d at 1089.

The Manual instructs officers to "consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice." The Manual notes that "withdrawal should ordinarily not be permitted in situations where there is obvious, deliberate fraud on the part of the applicant," citing as an example of obvious fraud the use of counterfeit documents. *Raya-Vaca*, 771 F.3d at 1207.

Mr. Angulo relies heavily on the facts and circumstances discussed in *Raya-Vaca, id*., at 1208-1211, to establish that he too had plausible grounds for relief. Mr. Angulo contends his circumstances are comparable to Raya-Vaca, despite the fact that a critical consideration in the analysis of Raya-Vaca's plausibility determination, was that unlike Barajas-Alvarado, Raya-Vaca had not deliberately presented false documents to inspection officers thereby committing obvious, deliberate fraud. *Id.* at 1207-1208 (Barajas-Alvarado's commission of obvious and deliberate fraud was a crucial consideration of singular importance militating against withdrawal, while such fraud was absent in *Raya-Vaca*.)

On August 24, 2000, Mr. Angulo presented a counterfeit entry document to an immigration officer at the San Ysidro Port of Entry, similar to the acts of Barajas-Alvarado. Mr. Angulo however seeks to distinguish his deliberate presentation of a false visa to gain admission, from that of Barajas-Alvarado, who presented a fraudulent permanent resident card at a Port of Entry to gain admission (*Barajas-Alvarado,* 655 F.3d

at 1080), by arguing the fraud in this case should be viewed as less aggravated. [Doc. No. 25-1, at 31.]

Defendant correctly identifies that the legitimate use of a legally-issued visa allows only temporary travel to and from the United States, while a permanent resident card affords the alien the much more significant right to live and work in the United States. Mr. Angulo however acknowledged he purchased a false visa document to present at the Port of Entry to gain admission to the United States so he could travel to San Diego and seek employment. [Doc. No. 36-1, at 25.] The Court therefore finds unpersuasive defendant's argument that the nature of the entry document he used to obtain false entry is a mitigating factor that makes Mr. Angulo's fraudulent intent at the Port of Entry less aggravated than that of Barajas-Alvarado.

Mr. Angulo's attempt to enter the United States with a false document had a "disqualifying effect" and weighs strongly against discretionary relief. *See Garcia-Gonzalez*, 791 F.3d at 1179 (when there is deliberate fraud on the part of applicant the first and third factors from the Field Manuel weigh strongly against discretionary relief); *see also Raya-Vaca*, 771 F.3d at 1210 (cases that involve deliberate fraud render relief implausible). The first and third factors, seriousness of the immigration violation and intent to violate the law, weigh heavily against Mr. Angulo.

Mr. Angulo had a 1996 misdemeanor conviction for use of a controlled substance, as well as four voluntary returns prior to the expedited removal proceeding, one only days before. [Doc No. 31, at 5; Doc No. 35-1, at 11.] Although demonstrating recidivist immigration violations, Mr. Angulo had no previous finding of inadmissibility, the second factor, which therefore does not weigh against him.

Mr. Angulo had no petitions for status pending in August, 2000, [Doc. No. 25-2, at 29], and no family member at the time who was a United States citizen,[6] so it was not

---

[6] His sister married a United States citizen and obtained citizenship in approximately 2004. [Doc No. 25-2 at 17.]

8

17cr3671-CAB

evident that he could have "easily" overcome his inadmissibility for lack of valid documentation. The fourth factor to be considered did not weigh in his favor.

Mr. Angulo was approximately 28 years old at time, and did not allege any health issues. [Doc. No. 36-1, at 25.] So the fifth factor for the immigration officer to consider, age or poor health, also did not weigh in his favor.

Mr. Angulo asserts that the sixth factor, humanitarian or public interest considerations, weigh in favor of finding it plausible he would have been permitted to withdraw his application in August, 2000. The Ninth Circuit has recognized a "compelling humanitarian interest in keeping families united." *Raya-Vaca*, 771 F.3d 1208-09 ("family unity" is in the public interest). Defendant claims deep familial ties in the United States. [Doc. No. 25-1, at 29-30; Doc. No. 25-2, at 4, ¶¶ 10-13.]

Defendant had two siblings and an uncle that raised him in the United States, as well as other "extended family." [Doc. No. 25-2, at 4, ¶¶ 12-13.] During the expedited removal hearing, he only disclosed to the investigator that he had a sister in the United States. [Doc. No. 36-1, at 25.] He has not claimed parents, a wife or children in the United States.[7] Unlike Raya-Vaca, who had long-term partner who was a citizen and children in the United States, *Raya-Vaca*, 771 F.3d 1208, Mr. Angulo had neither in August, 2000.

Nor does Mr. Angulo's declaration make clear that he was residing with, or even near, any of his other family. Defendant first came to the United States to seek work in the "late 1980s/early 1990s" but he does not aver that his presence was continuous or his work steady leading up to August, 2000. He worked various seasonal agricultural jobs and other jobs in various states around the United States. [Doc. No. 25-2, at 3-4, ¶¶ 8-9.] His record reflects Border Patrol apprehensions over the years that resulted in voluntary

---

[7] The defendant's declaration references a child born in 2000 and that he is the sole provider for his wife and son, but he does not state that now, or in August 2000, either his wife or son were among the family he claims in the United States. [Doc No. 25-2, at 4, ¶¶ 12-14.]

returns, on March 21, 1994; March 7, 1999; April 2, 2000; and August 21, 2000, suggesting he returned to Mexico repeatedly. [Doc. No. 31-at 5.]

Even weighing this factor in the defendant's favor, Mr. Angulo's family ties in the United States are not sufficient to overcome the "disqualifying effect of 'obvious, deliberate fraud on the part of the applicant'." *Barajas-Alvarado*, 655 F3d at 1080, 1091 (the defendant's stated intent to reunite with his family and seek employment in the United States carried little weight in light of his intentional fraud.)

Mr. Angulo has not made a plausible showing that the facts presented would have caused the immigration officer to exercise discretion in his favor and has failed to establish prejudice. The defendant's § 1326(d) motion to collaterally attack his August 24, 2000 Expedited Removal is **DENIED.**

### C. Defendant's Immigration Contacts from August, 2000 to June, 2004

After Mr. Angulo's expedited removal in August 2000, prohibiting his reentry for a period of five years [Doc. No. 36-1, at 28], the defendant was apprehended on three occasions, January 17, 20 and 21, 2001, in the area of Calexico, California, by Border Patrol upon entry into the United States and allowed Voluntary Return. [Doc No. 37-1, at 2-7.] On or about January 29, 2001, Mr. Angulo reentered the United States and on January 31, 2001 was convicted of a misdemeanor for evading a peace officer. [*Id*., at 9; Doc No. 31, at 5.]

While in Imperial County Jail for the misdemeanor conviction, Mr. Angulo was referred to immigration authorities and processed for Reinstatement of Expedited Removal. [Doc. No. 37-1 at 8-13.] Based on his 2000 removal, and unauthorized reentry on or about January 29, 2001, Mr. Angulo's order of removal was reinstated and he was removed and prohibited from reentry for 20 years. [*Id.*, at 11.]

On or about January 22, 2002, Mr. Angulo reentered the United States without authorization, and on March 6, 2002 he was apprehended by Border Patrol driving a vehicle containing 11 undocumented aliens. Mr. Angulo was allowed Voluntary Return on that occasion. [*Id.*, at 14-15.] On May 18, 2003, following an unauthorized entry on

10

17cr3671-CAB

or about May 15, 2003, Mr. Angulo was arrested driving a vehicle in relation to the suspected transportation of undocumented aliens. [Doc. No. 38-1 at 1-2.] Mr. Angulo was processed for Reinstatement of Expedited Removal and removed from the United States for a period of 20 years. [*Id*., at 3-8.]

Four months later, on or about September 21, 2003, the defendant returned to the United States, and was apprehended on September 23, 2003, by Border Patrol. [*Id*., at 9-11.] Mr. Angulo was processed for Reinstatement of Expedited Removal and removed from the United States on September 30, 2003, for a period of 20 years. [*Id*., at 12-17.]

On or about April 1, 2004, the defendant returned to the United States. On May 24, 2004, Mr. Angulo was arrested in San Diego, California during an investigation of an alien smuggling operation allegedly run by the defendant's brother, and involving the defendant. [Doc. No. 39-1 at 2-24.] After his interview by Border Patrol, Mr. Angulo was served on May 25, 2004, with a Notice to Appear in Immigration Court. [Doc. No. 39-2, at 2-3.]

**D. Defendant's June, 2004 Order of Removal**

On June 3, 2004, Mr. Angulo appeared before an immigration judge (IJ) for removal proceedings. [Doc. No. 25-2, at 7-22, Hearing Transcript]. He was advised by the IJ that the purpose of the hearing was to determine if he would be allowed to stay in the United States or not, that he would have the opportunity to present his case to the judge, and was informed of the consequences of removal. [*Id.,* at 7, 10.]

Mr. Angulo was told he had the right to postpone the hearing and obtain counsel at his own expense, to challenge the evidence presented by the government, bring and present his own documents and witnesses to support his case and testify on his own behalf. [*Id.,* at 8, 11]. He was told that there are forms of relief from an order of removal, but not specifically told he could request consideration for voluntary departure. [*Id*., at 8.] The defendant was also advised in some detail of his right to appeal the IJ's decision. [*Id*., at 9.]

11

17cr3671-CAB

Mr. Angulo seeks to collaterally attack his 2004 Order of Removal claiming it was fundamentally unfair. [Doc. No. 25-1 at 6.] He asserts his due process rights were violated by defects in the underlying proceeding. Specifically, the defendant argues that (1) the IJ failed to meaningfully advise him of his eligibility to seek voluntary departure; (2) he was not provided a full and fair hearing; and (3) the IJ erroneously relied on false or inaccurate information provided by the government. [*Id.*]

The IJ did not specifically inform Mr. Angulo that he could request voluntary departure as a form of relief from an order of removal or enumerate the factors the IJ would consider in evaluating such a request. It is mandatory that the immigration judge inform the respondent of his or her apparent eligibility to apply for a waiver of deportation and afford the respondent an opportunity to make an application during the hearing. *See U.S. v. Muro-Inclan*, 249 F.3d 1180, 1183 (9th Cir. 2001). If the record raises a reasonable possibility the alien may be eligible for relief, the IJ must inform the alien of this possibility and give him the opportunity to develop the issue. Failure to do so is denial of due process. *Id.*, at 1183.

In this case, the IJ recognized the possibility that the defendant could be eligible for voluntary departure, and expressly stated on the record he considered Mr. Angulo for such relief. [Doc. No. 25-2, at 21.] The IJ individually interviewed Mr. Angulo to afford him the opportunity to develop the issue. He inquired about Mr. Angulo's immigration history, any family in the United States who have legal residence or citizenship, his length of time in the United States, and his employment history. He provided Mr. Angulo an opportunity to develop his positive factors for eligibility. He was also given the opportunity to refute the representations made by the government regarding his immigration apprehensions, which Mr. Angulo did not dispute.[8] [Doc. No. 25-2, at 16.]

---

[8] Defendant contends now that the government provided the IJ "blatantly false" information regarding Mr. Angulo's immigration record. [Doc. No. 25-1, at 12.] At the immigration hearing, the government represented that Mr. Angulo had 17 prior apprehensions by border patrol officials, including two expedited removals. [Doc. No. 25-2, at 16]. Mr. Angulo it appears had 14 prior apprehensions,

Despite this, the defendant argues that the proceeding did not result in a full and fair hearing, because Mr. Angulo did not first receive an adequate explanation of the procedure of applying for voluntary departure and the types of evidence he could present to support his case. Without understanding the nature and significance of evidence the defendant could tender, the defendant contends that the IJ's preliminary advisal that the defendant could offer documents and witnesses to support his case was meaningless.

An IJ breaches the obligation to inform an alien of "apparent eligibility" when the IJ either fails to give the alien any information about the existence of relief for which the alien is "apparently eligible," or when the IJ erroneously tells the alien that no relief is available, or states the alien is eligible for relief but immediately negates that statement. *See U.S. v. Gonzalez-Flores*, 804 F.3d 920, 927 (9th Cir. 2015). This case does not fit neatly into any of these categories. The IJ did not erroneously tell Mr. Angulo he was ineligible, or summarily deny him relief. He recognized Mr. Angulo's eligibility for consideration for voluntary departure and afforded him the opportunity to make application during the hearing by inquiring about his positive and negative factors, before reaching his discretionary decision.

The IJ did not however tell Mr. Angulo he was evaluating him for voluntary departure or explain the type of evidence Mr. Angulo might offer (beyond truthful and complete responses to the IJ's questions at the hearing) to assist in the decision. Defendant contends this constitutes a due process violation despite the interview the IJ conducted to determine Mr. Angulo's eligibility. The Court is not persuaded, under these circumstances, the failures asserted by defendant rise to the level of a due process

---

including one expedited removal and three reinstatements of expedited removal, prior to his June 3, 2004 removal hearing. [Doc. No. 31, at 5-6.] The Court concluded at the hearing on this motion, and defendant's counsel conceded, that the discrepancy was not material.

violation, but even assuming defendant has met that burden, the Court finds no prejudice.[9]

The defendant bears the burden of proving prejudice by making a "plausible showing" that an IJ presented with all the facts would exercise discretion in the alien's favor. *Id*. This is a two-step process. First the court considers the positive and negative factors an IJ would consider relevant to an exercise of discretion. "Positive factors include 'long residence, close family ties to the United States and humanitarian needs.' Negative factors include 'the nature and underlying circumstances of the deportation grounds at issue; additional violations of the immigrations laws, the existence, seriousness, and recency of any criminal record; and any other evidence of bad character or the undesirability of the applicant as a permanent resident." *Id.*

Second, the court determines "whether, in light of these factors and the circumstances of the alien's case, the alien carried the burden of proving 'it was plausible (not merely conceivable) that the IJ would have exercised his discretion in the alien's favor'." *Id.* In assessing whether the alien carried this burden, the court considers whether aliens with similar circumstances received relief. "The existence of a single case that is arguably on point means only that it is 'possible' or 'conceivable' that a similarly situated alien would be afforded voluntary departure…. That is plainly insufficient." *Id*. at 928.

In this case, the IJ considered Mr. Angulo's residence history. Mr. Angulo told the IJ he came to the United States in 1987. But the defendant also acknowledged that he has been in and out the United States over the years since he first came. [Doc No. 25-2 at 18.] Mr. Angulo's immigration contacts confirmed that he was not steadily in the United States since 1987, and in the four years immediately preceding the hearing, Mr. Angulo

---

[9] Assuming a due process violation resulting from the failure to inform the defendant of his right to request voluntary departure, the Court finds his waiver of appeal was not "sufficiently considered and intelligent." *Gonzalez-Flores*, 804 F.3d at 927.

had been apprehended entering, or shortly after entering, the United States on ten occasions.

Mr. Angulo argues he was not given a fair opportunity to fully develop his employment history as a positive factor. The defendant did inform the IJ he came to the United States for seasonal field work and traveled throughout the country to various places were work was available. [*Id*. at 18-19.] Although his declaration indicates that "throughout the time [he has] lived in the United States," he worked other types of jobs, he does not indicate which of those jobs he worked before 2004 that he could have disclosed to the IJ, or how they would have been a significant consideration in the evaluation. [Doc No. 25-2, at 3-4, ¶ 8.]

The IJ asked Mr. Angulo about his family ties and he informed the IJ that neither of his parents, or his grandparents, or his wife were citizens or legal permanent residents and that he had no U.S. citizen children. [*Id.*, at 14, 18.] He does not dispute the accuracy of this response. When asked to identify family with legal residence or citizenship, he identified only his brother-in-law as an American citizen and his sister as a legal resident about to obtain citizenship through her husband. [*Id.*, at 16-17.] He did not inform the IJ that he also has an uncle with legal permanent residence status. That is the only other family member he has identified with residence status. [*Id.*, at 4, ¶¶ 10-13.]

Mr. Angulo has not made representations that he had any humanitarian factors he was precluded from presenting to the IJ. He does not dispute he told the IJ he wanted to go back to Mexico as soon as possible to his family. [*Id.*, at 21.]

With regard to any negative factors, the IJ was aware of Mr. Angulo's immigration record. Further inquiry would have resulted in disclosure that Mr. Angulo had three apprehensions connecting him as a driver involved in alien smuggling activities, and an expedited removal based on the presentation of a counterfeit entry document at the Port of Entry. This additional information would not have aided him.

The IJ considered Mr. Angulo's positive factors and weighed them against his immigration history of repeated violations and "abuse of voluntary departure privileges,"

and exercised his discretion to deny Mr. Angulo voluntary departure. [*Id*.]   The Court finds that the only additional positive factor Mr. Angulo has presented is the legal permanent residence status of an uncle that he did not disclose at the hearing.  That additional consideration, had he disclosed it at the hearing would not plausibly have caused the IJ to exercise discretion in his favor.

Finally, the cases the defendant references as similar in circumstance to support his plausibility burden are not persuasive.  Of the cases cited by defendant as examples of similarly-situated aliens who received voluntary departure, [Doc. No. 25-1 at 13-14] the aliens almost uniformly reported a United States citizen spouse, child, or family, which is not present in this case.

Mr. Angulo's positive equities are minimal.  His residency in the United States was not consistent, he did not attend school in the United States or hold a steady job.  He admits his wife and child do not have legal status in the United States and his declaration does not identify them as family present in the United States, and in 2004 he stated he wished to return to them in Mexico.  On the negative side, his immigration history shows repeated disregard for immigration law, use of a counterfeit entry document and reflects admissions of involvement in alien smuggling activities.

Mr. Angulo has failed to carry his burden of showing a grant for relief was plausible, as he has not demonstrated he suffered prejudice as a result of the defects he asserts in his deportation proceeding. The defendant's § 1326(d) motion to collaterally attack his June 3, 2004 Order of Removal is **DENIED**.

**IT IS SO ORDERED.**

Dated:  April 25, 2018

Hon. Cathy Ann Bencivengo
United States District Judge